**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
JERRY ROSEMIN,                                                    **Case No.:**

                Plaintiff,

                                        **COMPLAINT**

    -against -

                                        **JURY TRIAL**
                                        **DEMANDED**

FARROW & BALL, INC.,
SARA BROWNSTEIN, and
MEGHAN FORT,

                Defendants.
-------------------------------------------------------------------------x

Plaintiff Jerry Rosemin (hereinafter "Plaintiff"), by his attorneys Goddard Law PLLC, alleges upon knowledge with respect to himself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff brings this action to remedy discrimination in the terms and conditions of his employment on account of his race and age; retaliation for his protected activity in opposing such discrimination; and unequal pay on account of his race pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA"); and the District of Columbia Human Rights Act.

2.     Plaintiff is a 43-year-old Black respected sales professional who successfully served as Showroom Manager of Defendant Farrow & Ball's Washington DC showroom,

exceeding the showroom's sales goals and having the most paint primer sales of any showroom globally for the fiscal year of 2020.

3.      Plaintiff's record of excellent performance proved meaningless, however, after Sara Brownstein, a white woman in her early thirties, was named Defendant Farrow & Ball's District Showroom Manager in or around September 2020 and soon after, in cohort with the Vice President of Sales, Meghan Fort, a white woman in her early forties, terminated almost all of Defendant Farrow & Ball's East Coast showroom managers that were over forty and all that were Black.

4.      Upon information and belief, District Manager Brownstein and VP of Sales Fort's actions were part of Defendant Farrow & Ball's broader efforts to move in a newer, younger, and whiter direction in anticipation of the company's anticipated acquisition by a Danish paint manufacturer, Hempel, which took place in or around May 2021.

5.      Plaintiff was just one of a large number of older and Black employees at Defendant Farrow & Ball who found themselves on the chopping block after Brownstein became District Manager and Fort became the VP of Sales.

6.      Plaintiff seeks economic, non-economic, and punitive damages, including all allowable interests, penalties, and liquidated damages, and his reasonable attorney fees and expenses incurred in pursuing his claims.

## JURISDICTION AND VENUE

7.      The Court has federal subject-matter jurisdiction over Plaintiff's ADEA and Title VII claims, as well as diversity jurisdiction because no party is a resident of the same state as any other party.

8.      The Court has supplemental jurisdiction over Plaintiff's D.C. Human Rights Act claims.

9.      Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant Sara Brownstein is a resident of the State of New York.

## PARTIES

10.      Plaintiff is a 43-year-old Black male resident of the State of Virginia.

11.      At all relevant times, Plaintiff was Defendant Farrow & Ball's "employee" within the meaning of federal, state, and local anti-discrimination laws.

12.      Plaintiff was subject to sex, age, and race discrimination that resulted, ultimately, in his termination from Defendant Farrow & Ball.

13.      Defendant Farrow & Ball, Inc. is a business corporation organized and existing under the laws of the State of Delaware, and registered and authorized to do business in New York.

14.      At all relevant times, Defendant Farrow & Ball maintained a showroom in Washington DC located at 5221 Wisconsin Ave NW, Washington, DC 20015.

15.      Defendant Sara Brownstein ("Defendant Brownstein") is a white woman in her early-mid thirties and a resident of New York State.  She was at all relevant times Defendant Farrow & Ball's "District Manager." Defendant Brownstein was Plaintiff's supervisor and/or had supervisory authority over Plaintiff, including the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

16.      Defendant Meghan Fort ("Defendant Fort") is a white woman in her early forties and a resident of California.  She was at all relevant times, Defendant Farrow & Ball's Vice President of Sales. Defendant Fort was Plaintiff's direct supervisor and had supervisory authority over Plaintiff, including the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment.

## SATISFACTION OF ADMINISTRATIVE REQUIREMENTS

17.     On February 14, 2022, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging claims of sex, race, and age discrimination, and retaliation, as well as unequal pay.  The Charge was cross-filed with the District of Columbia Office of Human Rights.

18.     On or about July 25, 2022, Defendant Farrow & Ball, Inc. filed a position statement with the EEOC in response to the Charge.

19.     On October 13, 2022, the EEOC issued a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

### *Plaintiff is Hired by Defendant Farrow & Ball*

20.     Plaintiff is a 43-year-old Black male individual with over 25 years of relevant professional experience.

21.     On or about August 18, 2020, Plaintiff received a letter from Paul Colley, the President of North America for Defendant Farrow & Ball offering him the position of "Showroom Manager" for Defendant Farrow & Ball's Washington DC showroom located at 5221 Wisconsin Ave NW, Washington, DC 20015 ("DC showroom").

22.     Plaintiff relocated to Washington DC from Florida for this work opportunity and started work on or about September 4, 2020.

23.     Plaintiff's starting annual salary at the time of hiring was approximately $65,300, health insurance, short term disability benefits, a life insurance plan, a 401k plan, and added payments for doing color consultations with clients of the showroom.

24.     Upon information and belief, although Plaintiff and the other non-Black showroom managers performed the same job and duties, they were not being paid equally and Plaintiff was paid significantly less.

25.     Plaintiff's direct supervisor was Defendant Meghan Fort, a white woman in her early forties, who around this time was promoted to "Vice President of Sales" to oversee both West Coast and East Coast sales.

26.     At all relevant times, Defendant Fort was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

27.     Defendant Fort had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

28.     In or around that same time, Defendant Farrow & Ball hired Defendant Sara Brownstein, a white woman in her early-mid thirties, for the newly coined position of "District Manager." Upon information and belief, Defendant Brownstein's job functions were designed to replace those of Paul Murray, the East Coast Regional Sales Manager, who, upon information and belief, was in his fifties at the time of his termination.

29.     At all relevant times, Defendant Brownstein was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant Brownstein had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

30.     From the beginning of his employment at Defendant Farrow & Ball, Plaintiff also realized that he was one of only two full-time employees in all East Coast showrooms to be a Black.

31.     Plaintiff also noticed early on that, in comparison to other paint companies, many of Defendant Farrow & Ball's paints that were shades of the color white were named in a manner

that appeared to celebrate white supremacy. By way of example, paints are named "Great White," "Strong White," and "All White," which often made Plaintiff feel uncomfortable because of how racist the names sounded.

32.     Moreover, Defendant Farrow & Ball had named its sales training program "All White," which also made Plaintiff feel uncomfortable and offended.

33.     The "All White" sales process  had to be used every single day as the basis of every client interaction.

34.     Company posters with the slogan "All White" were also placed on the walls of all showroom back rooms, making Plaintiff feel extremely uncomfortable.

35.     Plaintiff had to see the "All White" posters and use the "All White" method on a daily basis, which made him feel uneasy, humiliated, and uncomfortable.

### Defendant Fort Pushes Plaintiff to Hire Two White Employees

36.     Soon after his hiring in September 2020, Plaintiff was looking to hire new team members to assist him at DC showroom. Given that the showroom was so understaffed, and he had to do all the work on his own, Plaintiff was not required to submit detailed reports of his work except nightly emails with updates on the day's work and sales.

37.     From the beginning of the hiring process, Defendant Fort pushed Plaintiff to hire white employees by only recommending white candidates for him to select from. Moreover, Plaintiff was not given the opportunity to interview the employees even though, upon information and belief, it was standard policy for managers to at minimum participate in an interview of new hires for their showrooms.

38.     Plaintiff understood Defendant Fort's statements to mean that her ideal of a perfect employee was someone white since the only employees that she had been screening for hiring were white.

6

39.     Given that he was new at his job and Defendant Fort was his superior, Plaintiff did not want to risk upsetting her so he went along with her wishes and agreed to hire a white woman, Amanda Hodges ("Employee Hodges"), and a white man, Zachary Forester ("Employee Forester"), that Defendant Fort had found and recommended for hiring.

40.     Employee Forester started to work at the DC showroom part-time around November 2020 and Employee Hodges started around December 2020 as a full-time employee.

41.     However, from the beginning of Employee Hodges' employment at the DC showroom, it became evident to Plaintiff that she did not view him as her superior and constantly undermined his instructions and directions causing detrimental harm to client relations and an increase in customer service complaints in relation to their interactions with her.

42.     Moreover, on at least one occasion, Employee Hodges entirely bypassed Plaintiff by presenting her ideas to a client of his without getting Plaintiff's permission and/or without even mentioning it to Plaintiff first. Upon information and belief, Employee Hodges was insubordinate and rude to Plaintiff because he was Black.

43.     Plaintiff attempted to have conversations with Employee Hodges about her performance and insubordination but to no avail.

44.     In or around January 2021, given Employee Hodges' ongoing misconduct, Plaintiff felt compelled to complain about her to Defendant Fort. However, she brushed off his complaints and did not take any action about it.

45.     Upon information and belief, had a white employee complained about their subordinate, Defendant Fort would have looked into the matter more seriously.

*Plaintiff's Showroom Bypasses the Sales Goals For 2020 and Becomes Top Showroom Globally in Paint Primer Sales*

46.     Despite the issues with Employee Hodges, Plaintiff was a highly dedicated and motivated professional who was ambitious and proactive in his work and went above and beyond his job description throughout his employment at Defendant Farrow & Ball.

47.     Specifically, Plaintiff's showroom ended its 2020 fiscal year being the leading showroom globally in sales of paint primer, a significant accomplishment given that Defendant Farrow & Ball has about 60 showrooms worldwide.

### *Plaintiff Tries to Hire a Black Employee For His Showroom But Is Not Allowed to*

48.     In or around the end of January 2021, Employee Hodges quit her job at Defendant Farrow & Ball and soon after, around early February 2021, Employee Forester also had to quit because of school.

49.     Around early February 2021, Plaintiff started looking for new employees to hire to help him with the showroom's busy workload and was able to find a qualified part-time employee that was female and Black.

50.     Plaintiff informed Defendant Fort that he had found a someone to hire to help him given that both employees of the showroom were leaving and he urgently needed help.

51.     Soon after, Defendant Fort interviewed the Black woman that Plaintiff had found for the position of part-time showroom associate.

52.     After the interview, Plaintiff waited for Defendant Fort's approval for him to send the paperwork needed to the Human Resources department in order for the new employee to be officially hired but she was stalling on giving her permission for the hire to move forward.

53.     After about two weeks of not receiving a confirmation from Defendant Fort about sending the Black employee's paperwork to Human Resources, Plaintiff followed up with her to inquire about the delay.

54.     To Plaintiff's surprise, Defendant Fort came up with the excuse that the Human Resources department was backed up in Europe with new hires. When Defendant Fort had previously recommended that he hires the two white employees, she had immediately given him the green light to send their information to the Human Resources department without any delay.

55.     Upon information and belief, Defendant Fort had been stalling because she did not want a second Black employee to be hired at the DC Showroom.

56.     Given the fact that no additional employees were being hired to help Plaintiff at the showroom, Plaintiff took on more and more work tasks and was simply told to be "patient" and time he would inquire about hiring the employee that he had recommended.

57.     Upon information and belief, had Plaintiff been a white manager, he would not have been left without anyone to help him at his showroom for months.

***Plaintiff and Other Black and/or Older Managers Face Increase of Required Work Tasks in Effort to be Pushed Out***

58.     Even though Plaintiff was initially allowed to only send in nightly emails documenting the daily sales and client interactions, around January 2021, he was told by Defendant Fort and District Manager Brownstein that he would have to submit additional daily, weekly, and monthly reports which were entirely duplicative and unnecessary.

59.     Specifically, the managers were required to submit not only an end of the day report showing the sales numbers and list of sales, but also an early morning report that had to be submitted in the first thirty minutes of the workday with data from closing and how much had been cleared from the back office – a report that was based on data that Plaintiff received from reports that Defendant Brownstein and Defendant Fort already had access to.

60.     On top of the morning reports, managers were required to also submit much more detailed end-of-the-day reports than were ever required, in which they were supposed to document

every client interaction, both on the phone and in person on top of the standard sales transactions. Managers had to submit these reports on a daily, weekly, and monthly basis as well.

61.     Upon information and belief, Defendant Brownstein and Defendant Fort increased the managers' workload in order to overwhelm them with unnecessary work so that they would not be able to perform their sales duties as well as before, thus making it appear "justified" to then terminate or demote them.

62.     Upon information and belief, at the time when Plaintiff was forced to submit the additional reports, other older managers had already been disciplined and/or terminated as part of Defendant Farrow & Ball's plan to move into a newer, younger, and whiter direction in terms of employee hiring.

### *Defendant Fort Takes Clients Away from Plaintiff's Showroom*

63.     In or around the end of February 2021, Plaintiff noticed client information missing from the client tracker that he was using at his showroom.

64.     When he asked Defendant Fort about the client information missing, he was told that she had reassigned some of his clients to Defendant Brownstein. This was done with no prior notice or communication with Plaintiff.

65.     Plaintiff expressed his concern that if those clients of his are not listed in his showroom's tracker, those sales would not be reflected in the monthly and yearly sales of his showroom which would affect his monthly and yearly bonuses.

66.     Defendant Fort brushed off Plaintiff's concerns and simply stated, "Don't worry about it. We're trying to help you."

67.     Upon information and belief, had Plaintiff been a white manager, Defendant Fort would not have taken away his clients.

### *Plaintiff Is Terminated by Defendant Fort Without Any Explanation*

68.     In or around the end of March 2021, Plaintiff noticed the addition of two new people that he did not know of in his showroom's computer system.

69.     Plaintiff reached out to the IT department to point this out and to ask for them to remove the two newly added employees as he initially believed that these individuals had been added by mistake. Plaintiff received no response.

70.     On or about the morning of April 19, 2021, Plaintiff again emailed Human Resources to inquire about the additional two individuals that were listed as employees at his showroom.

71.     To Plaintiff's utter and complete shock, about thirty minutes later, Defendant Fort called him and told him that she was on the phone with "Ben" from Human Resources and that they wanted to inform him that someone would be relieving him of his position in thirty minutes and that he had to gather his belongings by that time, effectively telling him that he was being terminated.

72.     Plaintiff was especially shocked because Defendant Fort had never given her any indication that his work was anything less than excellent during the time that he had been working for Defendant Farrow & Ball.

73.     When Plaintiff asked to learn why he was being terminated, Defendant Fort responded that they did not have to give him a reason as he was an "at-will" employee.

74.     Exasperated, Plaintiff reminded Defendant Fort of his stellar performance, but she interrupted him and told him that it did not matter and that he just needed to gather his belongings.

75.     Up to that point, Plaintiff had never received any formal or informal complaint regarding his performance or any other matter.

76.     Plaintiff also received a letter confirming his termination which simply repeated that he was an "at-will employee," that this employment was "voluntary and for no specific period of time," and that Defendant Farrow & Ball "are free to terminate [his] employment at any time, for any reason or no reason," which was signed by Ben Palmer, People Operations Manager of Defendant Farrow & Ball.

77.     Defendant also tried to have Plaintiff sign a General Release and Waiver of all his claims against the company.

78.     Plaintiff was replaced by a white woman who became the DC Showroom's new manager.

79.     At the time that he was terminated, Plaintiff was about 42 years old.

80.     Upon information and belief, although Plaintiff and the other non-Black managers performed the same job and duties, they were not being paid equally and Plaintiff was paid significantly less.

81.     To add insult to injury, Defendant Farrow & Ball contested Plaintiff's request for unemployment benefits and falsely stated that he was terminated for "misconduct," despite the fact that Plaintiff had never received any complaint or discipline against him.

82.     Based on that false statement, Plaintiff had to wait about three months for the issue to be resolved and for him to receive unemployment benefits.   Upon information and belief, Defendant contested Plaintiff's unemployment benefits out of retaliation for Plaintiff's complaints of discrimination, and out of sheer malice.

83.     Plaintiff's benefits were ultimately approved because Defendant Farrow & Ball had no documentation of misconduct to support its decision to terminate Plaintiff.

***Defendant Farrow & Ball's Broader Pattern of Firing Older Managers and Managers of Color and Replacing Them by Younger, White, and Less Experienced Employees***

84.    Upon information and belief, the unlawful actions against Plaintiff were part of a broader pattern of Defendant Farrow & Ball terminating older and minority employees at the managerial level.

85.    Specifically, upon information and belief, around the time of Plaintiff's termination, there was a spate of layoffs at Defendant Farrow & Ball that disproportionately affected older and minority workers.

86.    Upon information and belief, a disproportionally large percentage of the laid off managerial employees were over the age of forty and/or employees of color, despite the fact that they had been high performing for multiple years.

87.    Upon information and belief, the employees that were unlawfully fired or compelled to retire around that time included, among others:  a. Paul Murray, a white man in his fifties who had been the East Coast Regional Sales Manager was terminated and replaced by Defendant Brownstein, a white woman in her thirties; b. Nicole Costello, a Hispanic/Latinx manager at the Flatiron showroom who was around fifty years old was terminated and replaced by a young white woman after she complained about a supervisor making a discriminatory comment in relation to her race; c. Lydia Tower, a white woman in her mid-forties who had been with the company for ten years was terminated and temporarily replaced by two part-time employees with no design experience at the D&D building showroom; d. A white woman in her sixties who was managing the Greenwich, Connecticut showroom was forced to retire; e. A white woman in her sixties who was required to accept a demotion at Defendant's Paramus, New Jersey location; f. Nalo McGibbon, a Black manager in her forties who was terminated from the New York City showroom on the Upper East Side.

88.     As a proximate result of Defendant Farrow & Ball's discriminatory conduct, Plaintiff suffered and continues to suffer significant monetary loss and damages, including the loss of past and future earnings, and other employment benefits.

89.     As a further proximate result of Defendant Farrow & Ball's discriminatory conduct, Plaintiff has been experiencing elevated stress levels, severe emotional distress, embarrassment, humiliation, and anguish, as well as other incidental and consequential damages and expenses.

90.     Defendant Farrow & Ball's conduct was outrageous and malicious, intended to injure Plaintiff, and carried out with reckless indifference to Plaintiff's protected civil rights, thereby entitling him to punitive damages.

**AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION**
***(Race and Color Discrimination in Violation of Title VII of the Civil Rights Act of 1964,***
***Section 1981 of the Civil Rights Act of 1866,***
***and D.C. Human Rights Act)***
***Against All Defendants***

91.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

92.     Defendants have discriminated against Plaintiff in violation of Title VII, 42 U.S.C. § 1981, and D.C. Human Rights Act by subjecting him to different treatment on the basis of his race and color directly and/or in aid and abettance of each other. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

93.     Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated Caucasians, and by subjecting him to disparate terms and conditions of employment, including by paying him an unequal wage, depriving him of advancement, and terminating his employment.

94.     The conduct of Defendants was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

95.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law.

### AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
*(Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964,*
*Section 1981 of the Civil Rights Act of 1866,*
*and D.C. Human Rights Act)*
*Against All Defendants*

96.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

97.     Defendants directly or in aid and abettance of each other subjected Plaintiff to a hostile work environment on the basis of his race and color, in violation of Title VII, 42 U.S.C. § 1981, and D.C. Human Rights Act. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

98.     The conditions of the hostile work environment that Plaintiff was subjected to were so severe or pervasive as to substantially alter the terms and conditions of Plaintiff's employment.

99.     The conduct of Defendants was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

100.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law.

### AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
*(Retaliation in Violation of Title VII of the Civil Rights Act of 1964,*
*Section 1981 of the Civil Rights Act of 1866,*
*and D.C. Human Rights Act)*
*Against All Defendants*

101.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

102.    Plaintiff complained to Defendants about the race and color discrimination he was subjected to during his employment with Defendants.

103.    Plaintiff's complaints were ignored and discouraged by Defendants.

104.    Plaintiff notified Defendants of the race and color discrimination he was subjected to and protested the harassment.

105.    Plaintiff's protest to Defendants about the race and color discrimination he was subjected to during his employment with Defendants was a protected activity under 42 U.S.C. § 1981.

106.    Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race and color discrimination, directly or in aid and abettance of each other.

107.    Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation.

108.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

109.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due him.

110.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional distress.

111.    As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

### AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION
*(Age Discrimination in Violation of the*
*Age Discrimination in Employment Act, 29 U.S.C. §§ 621*
*and the D.C. Human Rights Act)*

112.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

113.    Defendants have discriminated against Plaintiff in violation of federal and local law by subjecting him to different treatment on the basis of his age, directly or in aid and abettance of each other. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

114.    Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated younger employees, and by subjecting him to disparate terms and conditions of employment, including by paying him an unequal wage, depriving him of advancement, and terminating his employment.

115.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

116.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law.

### AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION

17

*(Hostile Work Environment in Violation of the*
*Age Discrimination in Employment Act, 29 U.S.C. §§ 621*
*and the D.C. Human Rights Act)*

117.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

118.    Defendants directly or in aid and abettance of each other subjected Plaintiff to a hostile work environment on the basis of his age, in violation of federal and local law. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

119.    The conditions of the hostile work environment that Plaintiff was subjected to were so severe or pervasive as to substantially alter the terms and conditions of Plaintiff's employment.

120.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

121.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of federal and local law.

## JURY DEMAND

122.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, having set forth his Complaint, Plaintiff respectfully requests that he be awarded all available relief under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the D.C. Human Rights Act, including, but not limited to, economic and non-economic compensatory damages in excess of $75,000, punitive damages, prejudgment interest, attorney fees, expenses, and costs, and all other and further relief that the Court deems just and proper.

Dated: New York, New York
         January 10, 2023

GODDARD LAW PLLC

___/s/ Megan S. Goddard___
Megan S. Goddard
GODDARD LAW PLLC
39 Broadway, Suite 1540
New York, New York 10006
(646) 504-8363
megan@goddardlawnyc.com

*Attorneys for Plaintiff Jerry Rosemin*